## SALT LAKE CITY v. O'CONNOR et al.

No. 4326.  Decided June 1, 1926.  (249 P. 810.)

*A. E. Moreton,* of Salt Lake City, for appellant.

*Wm. H. Folland,* City Atty., of Salt Lake City, for respondent city.

*James Ingebretsen,* of Salt Lake City, for respondent Utah Savings & Trust Co.

*James Ingebretsen* and *Fisher Harris,* both of Salt Lake City, for respondent Utah Lumber Co.

CHERRY, J.

This action arises out of a contract for certain public work in Salt Lake City, and involves the determination of certain claims of materialmen against the surety upon the bond of the contractor, and the distribution of the remainder due and unpaid upon the contract price. On October 23, 1922, John O'Connor (hereinafter called the contractor) entered into a contract with Salt Lake City for the construction of sewer extension 410, and pursuant to Comp. Laws

Utah 1917, § 3753, executed and delivered a bond in the sum of $31,000, conditioned for the faithful performance of his contract and the prompt payment for all labor and materials used in the work. National Surety Company (hereinafter called the surety) was the sole surety on the bond. Utah Fire Clay Company and Utah Lumber Company (hereinafter called materialmen) furnished materials which were used in the work, and Utah Savings & Trust Company (hereinafter called the bank) lent money to the contractor, secured by an assignment of all sums to become due on the contract.

The work was completed on June 9, 1924, at which time there remained due and unpaid upon the contract from the city the total sum of $8,714.90, of which amount $7,400 was, under the contract, payable in certain bonds. The contractor had disappeared. There was due and unpaid to the materialmen the sums of $19,681.83 and $2,207.21, respectively, and to the bank, on account of money loaned, the sum of $3,000. Conflicting claims to the unpaid portion of the contract price were made, whereupon the city brought this action, impleading the claimants above named, and prayed that they be required to set forth their respective claims, and the same be determined; that the city be permitted to pay into court the said sum due on the contract and be discharged, etc. The liability of the surety to the unpaid materialmen arose out of the controversy and became a part of the action.

By appropriate pleadings the claims of the respective parties were asserted and issues joined thereon. Two main controversies arose. As between the surety and the materialmen it was alleged and proved that the contractor had paid to the materialmen the sums of $5,650.96 and $252.83, respectively, at divers dates in February and May, 1923, with funds derived from the proceeds of bonds paid and delivered to him on account of the contract in question, which payments were applied by said materialmen upon pre-existing debts, arising out of a prior and independent transaction,

not secured by the bond involved in this action. The surety herein contended that the application of payments thus made could not be sustained, but that such payments must be applied in reduction of the claims of the materialmen for which it, the surety herein, was liable.

The other question involved the disposition of the remainder of the contract price, as between the bank, under its assignment, and the surety, who claimed an equitable right thereto superior to the assignee. Both questions were decided by the trial court adversely to the surety, and judgments were entered in favor of the materialmen against the surety for the full amount of their claims, and in favor of the bank that it had a lien and claim upon the unpaid contract price, superior to any claim of the surety. The surety has appealed.

With respect to the question of the application of the payments made to the materialmen, it was undisputed that the respective debts upon which the payments were applied were for balances due for materials furnished to the contractor for use in a similar, but prior, contract with Salt Lake City for sewer extension 357, which work had been completed shortly before the work on the contract in question had begun. The bond in connection with the contract for sewer extension 357 was executed by a surety company other than the surety herein. It was represented that the recourse of the materialmen upon this bond had expired by lapse of time when the controversy arose with the surety herein. The payments in question were made shortly after the work on the first contract had been completed and the work on the second had begun. The fact that final payment of the amount due on the first contract was made to the contractor by the city on September 23, 1922, was proved at the trial, but it was not claimed that the materialmen knew of this fact at the time.

As indicating the commingling or overlapping of the two transactions, however, it was shown that the contractor paid

out on the last contract about $19,000 before receiving any payment on account thereof from the city. These advance payments were made by checks upon the contractor's general bank account, in which were deposited money from various sources, including payments received on account of the first contract. The trial court found as facts that the materialmen, at the time the payments were made, had no knowledge of the source of the money paid to them, and that the contractor directed that the payments be applied upon the pre-existing indebtedness, to which it applied. These findings are assailed by appellant as being insufficiently supported by the evidence. There were circumstances testified to tending to indicate that the materialmen ought to have known or did know the source of the money paid them, but their positive evidence to the contrary, and other circumstances in the matter, furnish a sufficient basis for the finding of the trial court. There was satisfactory evidence that the contractor directed the application of payments as made. The findings must therefore stand.

The question is thus reduced to whether, in such circumstances, the application of payments so made by the parties is valid as against the surety on the bond, or whether the surety, when sued upon the bond, may require that such payments be applied on the particular indebtedness for which it is liable. There is a conflict of law upon the subject.

The appellant surety insists upon its legal right to have the payments applied in reduction of the indebtedness for which it is liable, upon the grounds that it has a special equity in the proceeds of the contract secured by its bond, and that, if not so applied, the net effect is to hold it liable for indebtedness not included in its contract. The authorities cited and relied on by appellant are: (1892) *Crane Co. v. Keck,* 35 Neb. 683, 53 N. W. 606; (1896) *Young v. Swan,* 100 Iowa, 326, 69 N. W. 566; (1897) *Merchants' Ins. Co. v. Herber,* 68 Minn. 420, 71 N. W. 624; (1898) *United States v. Am. Bonding & T. Co.,* 89 F. 925, 32 C. C. A. 420; (1904)

*Crane Co. v. Pac. H. & P. Co.,* 36 Wash. 95, 78 P. 460; (1904) *First Nat. Bank v. Nat. Surety Co.,* 130 F. 401, 64 C. C. A. 601, 66 L. R. A. 777; (1914) *Columbia Digger Co. v. Rector* (D. C.) 215 F. 618; (1915) *Columbia Digger Co. v. Sparks,* 227 F. 780, 142 C. C. A. 304; (1916) *Sioux City F. & M. Co. v. Merten,* 174 Iowa, 332, 156 N. W. 367, L. R. A. 1916D, 1247; (1921) *Alexander Lbr. Co. v. Aetna Acc. & L. Co.,* 296 Ill. 500, 129 N. E. 871.

Most of these cases are distinguishable from the case under review. Considerations and factors not present in the case at bar entered into numerous of the cases cited, and obviously controlled the decisions. Thus in *Young v. Swan,* supra, *First National Bank v. Nat. Surety Co.,* supra, and *Merchants' Ins. Co. v. Herber,* supra, the moneys paid did not belong to the debtor at all, but were trust funds to which the debtor had no title. The last case is expressly so distinguished by a later case in the same court (*Standard Oil Co. v. Day,* 161 Minn. 281, 201 N. W. 410, 41 A. L. R. 1291), which holds to the contrary, where the money paid belongs to the contractor.

In *United States v. Am. Bonding & T. Co.,* supra, the creditor had misrepresented the indebtedness of the debtor to him to induce the surety to give the bond, and afterwards took notes for the secured debt and extended the time of payment. The court, applying the rule of strict construction relating to the liability of sureties, discharged the surety. In *Crane Co. v. Pac. H. & P. Co.,* supra, the creditor had knowledge of the source of the money paid. In a later case the same court (*Sturtevant Co. v. F. & D. Co.,* 92 Wash. 52, 158 P. 740, L. R. A. 1917C, 630) decided that knowledge or the lack of it, as the case may be, by the creditor, of the source of the money paid, determines the question. In *Columbia Digger Co. v. Rector,* supra, the first application had been made in the interest of the surety, and was afterwards sought to be changed to his detriment, besides the creditor had knowledge of the source of the money paid. The court

held that the first application dicharged the surety pro tanto, and that the surety had the equitable right to have the installments of the contract price applied to materials used in the contract work where the materialmen received payments with knowledge of their source.

In *Columbia Digger Co. v. Sparks,* supra, a federal case arising in Washington, a decision of two judges out of three, based mainly on *Crane Co. v. Pac. H. & P. Co.,* supra, holds the surety not bound by the application of payment to a pre-existing debt. The dissenting opinion by Judge Rudkin in this case is substantially approved in a later Washington case. *Sturtevant v. F. & D. Co.,* supra. The cases of *Crane Co. v. Keck,* supra, *Sioux City F. & M. Co. v. Merten,* supra, and *Alexander Lbr. Co. v. Aetna Acc. & L. Co.,* supra, fairly suppport the appellant's contention, although in the last case some importance seems to be attached to the fact, there appearing, that the materialmen knew that at least a portion of the money in question paid to it was derived from the contract secured by the bond. This case also applied the rule that the obligation of a surety is to be construed strictly, which, so far as concerns paid sureties, is not the law in this state. *Walker R. Co. v. Am. Surety Co.,* 60 Utah, 435, 211 P. 998.

On the part of respondents it is contended that the general rule of law, which permits the debtor and creditor to direct the application of payments, governs transactions of this kind; that the surety has no special equity in the contract price, after it has been paid to the contractor, and that, especially where the creditor accepts payments from the contractor without knowledge of the source of the money paid, he may take and apply it free from any control or equity on the part of the surety. The respondents cite and rely upon the following authorities: (1896) *People v. Powers,* 108 Mich. 339, 66 N. W. 215; (1921) *Vosburgh v. Middleditch,* 214 Mich. 489, 183 N. W. 208; (1913) *Chicago Lbr. Co. v. Douglas,* 89 Kan. 308, 131 P. 563, 44 L. R. A. (N. S.) 843;

(1916) *Crane Co. v. Wichita U. T. Ry. Co.*, 98 Kan. 336, 158 P. 59; (1924) *Standard Oil Co. v. Day*, 161 Minn. 281, 201 N. W. 410, 41 A. L. R. 1291; (1913) *Crane Co. v. U. S. E. & G. Co.*, 74 Wash. 91, 132 P. 872; (1916) *Sturtevant Co. v. F. & D. Co.*, 92 Wash. 52, 158 P. 740, L. R. A. 1917C, 630; (1892) *Mack v. Colleran*, 136 N. Y. 617, 32 N. E. 604; (1878) *Harding v. Tifft*, 75 N. Y. 461; (1905) *Wanamaker v. Powers*, 102 App. Div. 485, 93 N. Y. S. 19; (1915) *St. L. S. & D. W. v. Tonkins*, 188 Mo. App. 1, 173 S. W. 47.

The syllabus in *People v. Powers*, supra, is:

"Sureties on the bond of a contractor for a public improvement requiring payment for all labor and material furnished for the work are not released, by payment of an antecedant debt by the contractor to a materialman from the contract price, to the extent of such payment, from liability to such materialman for materials furnished."

This sylabus was quoted and approved in the later Michigan case above cited.

In *Chicago Lbr. Co. v. Douglas*, supra, the Kansas court in deciding the question against the claim of a surety, said:

"However, the laborers and materialmen were not under obligations to watch the dealings between the state and the contractors. A bond had been given to secure the payment of their claims. That bond having been given, and there being no provision in it requiring those furnishing labor and material to watch the source from which money paid was derived, or to make any particular application of payments when made, they owed no duty to the surety company to do so." And the other condition of the bond "was the unqualified condition that the surety company would pay all indebtedness incurred for labor and material furnished and used in the building, and that was one for the benefit alone of the laborers and materialmen. For a valuable consideration the surety company gave this bond guarantying that the labor and material furnished would be paid for. The giving of such a bond relieves the laborer and materialman from looking after liens or other security. The owner is then at liberty to pay his contractor when he pleases without liability to any subcontractor, and the contractor is free to draw his money from the owner and pay it out as he may

choose. The duty of the lumber company and the liability of the surety company are measured by the terms of the bond. There is nothing in it, as we have seen, which requires that money received by the contractor for the structure shall be applied on the claims of those furnishing labor and material, but there is an absolute and unqualified guaranty that all indebtedness for labor and materials shall be paid."

In *Standard Oil Co. v. Day*, supra, the materialman knew the money paid him came from the contract price on the work mentioned in the bond. By agreement with the contractor it was applied on an old unsecured debt. The court sustained the application of payment and held the surety for materials furnished to the contractor, without deduction on account of the payment. The theory that money paid a contractor, in such case, is impressed with an equity in favor of the surety, is expressly rejected. The court said:

"The creditor should not, in the collection of his money, be burdened with the responsibility of having to know the status of his debtor's accounts nor the status of the obligation of the surety of the debtor. The surety in modern business should be, and usually is, quite able to care for itself. It selects those for whom it becomes surety. Most contractors and subcontractors must necessarily use some of their money that they receive in payment of obligations not incurred in the particular contract from which their money is received. When they receive their money unconditionally, it is their own and they may do with it as they please. If a creditor must stop, before he accepts payments from his debtor, and make the impertinent inquiry as to his standing with his surety, the unsatisfactory results are obvious."

In *Sturtevant Co. v. F. & D. Co.*, supra, the syllabus upon this question is:

"Where a materialman applied money received from the contractor without instructions as to its application, which was derived from a contract for the performance of which the contractor had furnished surety, to an unsecured debt, in good faith, and without knowledge of the source of the money, he was entitled, as against the surety, to have his appropriation remain undisturbed and hold the surety on the bond for any deficiency, although as between materialman and surety there was but one debt; the application of the payments derived from the contract being one of the hazards surety assumed."

We are convinced that the better reasons as well as the preponderance of judicial opinion support the conclusions reached by the trial court upon this question.

In the public interest commercial transactions should not be fettered. The necessary complications of modern business should not be increased by avoidable additions. Money released into trade should be permitted to circulate freely, unburdened by hidden equities or liens. In transactions like the one under consideration, the surety has ample facilities for protecting itself. It may with propriety reserve and exercise a surveillance over the disbursemnt of the proceeds of contracts for the performance of which it is surety. Materialmen dealing with contractors cannot do so. They cannot, consistent with business proprieties, inquire into the sources of money paid them. When a surety as in the case at bar, permits money on the contract to be paid the contractor unconditionally, which it must know he may use for general purposes, we see no sufficient reason for sustaining any claim or equity in behalf of the surety, in such money, after it has been paid to another in the due course of business. The risk of such a loss is one of the hazards which the surety, for a fixed consideration assumes by its contract.

It is our conclusion that the appropriation of the payments in dispute, as made by the materialmen, were properly and legally made, and should be and are sustained.

The controversy between the bank and the surety concerning the unpaid portion of the contract price remains to be considered. On January 19, 1924, the bank lent $3,000 to the contractor upon his promissory note, secured by his assignment of "all moneys due or to become due under that certain contract between the undersigned and Salt Lake City, known as sewer extension No. 410." Notice of the assignment was given to the city immediately. The application of the contractor for the bond to the surety, dated in October, 1922, contains a provision to the effect that the contractor assigns, transfers and con-

veys to the surety all deferred payments and retained percentages, and all moneys to become due to the contractor, at the time of any breach or default in said contract, or that thereafter may become due and payable to the contractor on account of said contract, to be credited by the surety upon any loss sustained by it under the bond.

The contract contained a provision to the effect that, if the contractor failed to pay the laborers employed upon, or for materials used in, the work, the city might, at its option, withhold from the moneys due or to become due to the contractor, the necssary amounts to pay the same, and might pay the same, and deduct the amount from the final or other estimate due the contractor. Although not required by law, this stipulation was proper, and within the power of the city to make. *Pac. Coast Steele Co. v. Old Nat. Bank,* 134 Wash. 457, 235 P. 947. As before seen, the contractor failed to pay for the materials used in the work, and the city withheld for the sum of $8,714.90, the remainder of the contract price, which it declined to pay to either of the claimants, but rendered it into court to be disposed of by order of law.

It was contended by the bank that the money it lent to the contractor was used for the payment of labor performed on the work in question. Upon this subject the court found that the money was loaned to the contractor to enable him to pay for the labor performed on the contract, and that it was paid out for such labor and for other items. This finding is challenged by appellant for lack of evidence to support it. The finding is immaterial. Even if part or all of the money loaned by the bank was used for paying laborers, that fact would not improve the quality of the bank's claim. *Joint School Dist. v. Bailey-Marsh Co.,* 181 Wis. 202, 194 N. W. 171. It was admitted that the surety had paid $3,490.86 to persons not parties hereto, on account of labor and material furnished for the contract in question, and that there was over $20,000 due for material to the materialmen herein, for all of which the surety was liable.

The question to be decided is whether the surety, under the facts as above stated, has a right to the unpaid portion of the contract price remaining in the hands of the city, superior to the right of the bank, by virtue of its assignment from the contractor. The argument for the surety is that it had an equity, arising when it executed its bond, in the unpaid portion of the contract price, of which it could not be divested by any act of the contractor; that the provision in the contract for the optional retention of part of the contract price was for the benefit of the surety, as well as for the city; that upon payment by the surety of delinquent claims for material furnished it becomes subrogated, not only to any lien or preference of the materialmen whose claims it pays, but also to the rights of the contractor and the city with respect to the retained portion of the purchase price.

The main contention made against the right of the surety is that it succeeds only to whatever legal or equitable right exists in favor of the materialmen, whose claims it pays, and that in view of Comp. Laws Utah 1917, § 3753, materialmen have no lien or claim upon the contract price, but are merely secured by the bond, and therefore there is no preference in their behalf to which the surety may be subrogated. In other words, it is argued that "the trust fund doctrine," as applied to the unpaid contract price, is not applicable here, because the materialmen have no interest in or claim to such fund.

For the purposes of this case it may be assumed that the materialmen have no lien upon the funds remaining in the hands of the city and due upon the contract. Whether in case the bond was insufficient in amount, or the surety thereon had become insolvent, such a lien would exist in favor of laborers and materialmen, we do not decide. The case before us may be determined upon the theory that no such lien exists. Although, if that question was controlling, there might be difficulty in its correct solution, in view of

the option reserved by the city in the contract, and the fact that a sum of money was actually retained by it. Donnelly on the Law of Public Contracts, § 344, at page 482, says:

"The provision in the contract that the public body will retain a certain percentage out of current estimates serves to secure the public body against nonperformance of the contract, and gives the public body the right to hold these funds in case the contractor abandons his work in order to pay any damage it may suffer thereby. This right of the public body to retain these percentages inures from the time the contract is made, and until its claims and claims for labor and material as provided in the contract are paid, such right is superior to any equitable assignee of the contractor. And so, when the surety on the bond, of the contractor pays debts incurred by the contractor for labor and material, it is entitled to be subrogated to these rights of the public body against the fund in preference to such an equitable assignee, because the surety's right of subrogation is bound up in the contract and dates back to the time when it entered into the contract of suretyship. This is so for the further reason that this reserve fund is as much for the protection and indemnity of the surety as it is for the security of the public body, and an equity in such fund is raised in behalf of the surety. The right of subrogation is particularly applicable to these funds. This right cannot be defeated by a bank, which loans money to a contractor to carry on his work and takes an assignment to secure the loan, and the equity of the surety and his priority, in these reserved moneys will be sustained as against such an assignee, even though the fund is thereby exhausted, and nothing is left for the bank assignee. The bank is bound to know of the rights of a surety under these circumstances, and will be deemed to act with full knowledge of a surety's rights. Where, therefore, the surety on a contractor's bond completes work abandoned by a contractor, such surety is entitled to moneys under the contract, sufficient to save him from loss on his suretyship contract, and such right is superior to any assignment made by the contractor."

The case of *Prairie State Bank v. U. S.*, 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412, involving a government contract, is frequently cited upon the question under consideration. The facts in that case differ in some respects from the facts in the present case, but certain principles were decided which are relevant here. The contractor had defaulted in the performance of the contract, and his surety had completed the

contract. A bank had advanced money to the contractor, and taken an order or power of attorney authorizing it to receive the final payment under the contract from the United States. The attempted assignment of the contract price was in violation of the federal statute. In deciding the question of which of the two contestants had a superior right to the unpaid portion of the contract price, the court held that the surety was entitled to subrogation to the rights of the United States in the fund, and that the bank was not; that the right of subrogation entitled the surety to be substituted to the rights which the United States might have asserted against the fund; that a stipulation in a building contract for the retention, until the completion of the work, of a certain portion of the consideration, is as much for the indemnity of him who may be guarantor of the performance of the work as for him for whom the work is to be performed; and that it raises an equity in the surety in the fund to be created. It is further held that the equity and right of the surety arises upon the execution of its contract as surety, and that the right is paramount to any right of the contractor.

In *First Nat. Bank v. City T. S. D. & S. Co.*, 114 F. 529, 52 C. C. A. 313, a contract for public work in the city of Seattle, Wash., was involved, and a similar contest between a surety upon the contractor's bond and a bank, to whom the contractor had assigned, the contract price, was presented. The court cited and approved *Prairie State Nat. Bank v. U. S.*, supra, and held that the surety's right extended not only to that portion of the contract price which the contract itself provided should be reserved, but to all of the contract price in fact remaining unpaid, which in this case was a larger sum. In this case the contractor had abandoned the contract before its completion, leaving claims for labor and material unpaid. The surety paid the bills and completed the contract.

In *Henningsen v. U. S. F. & G. Co.*, 208 U. S. 404, 28 S.

Ct. 389, 52 L. Ed. 547, the facts on all essential points were the same as in the case at bar. The work required by the contract was completed, but certain claims for labor and material had not been paid. The contractor had executed an assignment of the payments due or to become due on the contract to a bank from whom he had borrowed money. The surety, being liable for the unpaid claims for labor and material, asserted its right by subrogation to the unpaid contract price in the hands of the United States. The contract contained no stipulation for retaining any part of the amount due for the payment of laborers and materialmen. There was due and unpaid upon the contract, however, the sum of $13,066. It was there argued in behalf of the bank that the contract, so far as the United States is concerned, had been fully performed, so there was no right of the government to which the surety could be subrogated; that the creditors furnishing labor and material had no lien upon the fund, and therefore there was no right in their favor to which the surety could be subrogated. It was held, however, that the equity of the surety was superior to that of the bank, and that the surety was subrogated to the fund in controversy. This case is not distinguishable from the case at bar, and, if followed, must be decisive.

A later federal case, *Hardaway v. Nat. Surety Co.*, 211 U. S. 522, 29 S. Ct. 202, 53 L. Ed. 321, is to the same effect, and decides that:

"The right of a surety on a bond for the performance of a contract given under the act of August 13, 1894, c. 280, 28 Stat. 278 [U. S. Comp. St. § 6923], to be subrogated to the contractor's claim for balances due from the government, is superior to that of one advancing money to the contractor on assignment of such claim."

The doctrine of the federal cases above referred to is approved and followed in the state courts. *Nat. Surety Co. v. Berggren,* 126 Minn. 188, 148 N. W. 55; *First Nat. Bank v. Pesha,* 99 Neb. 785, 157 N. W. 924; *Wasco Co. v. N. E. Eq. Ins. Co.,* 88 Or. 465, 172 P. 126, L. R. A. 1918D, 732 Ann. Cas.

1918E, 656, and note; *Joint School Dist. v. Bailey-Marsh Co.*, 181 Wis. 202, 194 N. W. 171.

On the part of respondent it is contended that in *Salt Lake Elec. Sup. Co. v. West*, 54 Utah, 564, 182 P. 215, this court has established a principle which is conclusive as applied to the case at bar, which principle is that materialmen, as such, have no vested right or recognized equity in the unpaid contract price. We have before pointed out that this case might be decided upon the theory that the materialmen had no such equity or lien, and the cases heretofore reviewed and cited fully sustain the right of the surety upon that hypothesis. Particularly in the case of *Henningsen v. U. S. F. & G. Co.*, supra, the argument was unsuccessfully made that there could be no subrogation when the laborers and materialmen had no lien upon the fund in question. The subrogation there was traced to the fund through the contractor. The same legal formula was followed in *Hardaway v. Nat. Surety Co.*, supra, and *First Nat. Bank v. Pesha*, supra, must necessarily rest upon the same principle, because there the materialmen had no lien. In *Wasco Co. v. N. E. Eq. Ins. Co.*, supra, the creditors paid by the surety had no lien, but the court said the surety "is entitled to be subrogated to the right of the county," by whom the fund had been retained.

The West Case, in this court, relied upon by respondent bank, involved the right to the unpaid contract price as between a materialman and the surety on the contractor's bond. The materialman for some reason did not proceed against the bond, but sued the contractor and attempted to reach the balance due on the contract by garnishment. The surety, who had paid out considerable sums on account of its liability, and to whom the contract price had been assigned by the contractor, asserted its superior right to the fund. The decision for the surety was essentially that the amended statute (Laws Utah 1917, c. 36) had so changed the remedy of the materialman as to render his claim no obstacle in the way of an assignment of the contract price

to the surety. The general expression employed in the opinion, "Whatever may have been the rights of the contractor to assign any amounts due from a public corporation for work in building or repairing public buildings prior to the 5th day of March, 1917, the date when chapter 36 became effective and section 1400x was expressly repealed, the right to make such assignment after that date cannot be questioned," must be qualified and limited by the facts and legal questions under consideration by the court, and in reference to which the expression was used. The right of the con-. tractor to assign the contract price to the surety in that particular case, notwithstanding the claim of the materialman who by statute had a substantial but different remedy, was affirmed. But whether a surety has such an equity in the contract price as will prohibit an assignment thereof to its prejudice by the contractor was not considered or decided, and the case is no authority on the question.

Other cases cited by respondent bank more or less bearing on the subject are: *Los Angeles R. & G. Co. v. Coast Const. Co.*, 185 Cal. 586, 197 P. 941; *Pacific Coast Steel Co. v. Old Nat. Bank,* 134 Wash. 457, 235 P. 947; *U. S. F. & G. Co. v. Mayor, etc.*, 79 N. J. Eq. 584, 81 A. 758, 37 L. R. A. (N. S.) 575; and *Hipwell v. Nat. Surety Co.*, 130 Iowa 656, 105 N. W. 318.

The first of these cases is distinguishable, because the contract there involved did not provide for payment to the contractor by the public body in money, but by the delivery to him of a warrant, assessment, and diagram authorizing him to collect assessments direct from the property owners affected. The scheme of payment rendered impracticable the retention of money for the benefit of claims against the contractor. The second case is essentially against the contention of the bank, and so far as the two other cases relate . to the subject they are opposed to the weight of authority and we decline to follow them.

The fact that the surety here was a hired surety, and not

entitled to have its contracts strictly construed in its favor (*Walker R. Co. v. Am. Surety Co.*, 60 Utah, 435, 211 P. 998), has no application here (*Nat. Surety Co. v. Berggren*, supra; *Wasco Co. v. N. E. Eq. Ins. Co.*, supra; *Joint School Dist. v. Bailey-Marsh Co.*, supra). We conclude that the unpaid contract price remaining in the hands of the city is charged with an equity in favor of the surety, which arose by virtue of the retention of the fund by the city and in point of time relates back to the time the contract of suretyship was entered into, and is uperior and paramount to any right of the contractor or his assignee.

The fund in question being charged with this equity, the assignment to the bank only transfers the contractor's interest therein, subject to the right of the surety. If the contractor was in person claiming the fund against the surety, no court would entertain his claim. His assignee has no larger right. The assignment transferred to the bank merely the contingent right of the contractor which might remain after all prior claims had been satisfied. This equity of the surety entitles it to be subrogated to the fund in question to the extent of its interest, which in this case, as before seen, extends to the whole of the fund.

The trial court erred in awarding judgment in favor of the bank. The surety is entitled to the funds tendered into court by the city. The judgments in favor of the materialmen against the surety are affirmed, and they are entitled to recover their costs on this appeal from the surety.

The judgment in favor of the bank is reversed and remanded, and the trial court is directed to recast its findings and conclusions to conform to this decision, and enter a judgment in favor of the surety for the fund in controversy. One-third of appellant's costs on appeal to be recovered from the respondent bank.

GIDEON, C. J., and THURMAN, FRICK, and STRAUP, JJ., concur.